Ursula C. WHYTE, etc., et al.,
Plaintiffs, Appellees,

v.

CONNECTICUT MUTUAL LIFE
INSURANCE COMPANY,
Defendant, Appellant.

Ursula C. WHYTE, a/k/a Wendy Whyte,
as Trustee of the S. William Whyte Revocable Trust, Plaintiff, Appellant,

v.

CONNECTICUT MUTUAL LIFE
INSURANCE COMPANY,
Defendant, Appellee.

Nos. 86–1295, 86–1296.

United States Court of Appeals,
First Circuit.

Argued Sept. 9, 1986.

Decided May 11, 1987.

recording." *United States v. Carbone,* 798 F.2d 21, 26 (1st Cir.1986).

Donald A. Beaudry and Pamela Rollins with whom Ely, King, Corcoran, Milstein &

Beaudry, Springfield, Mass., were on brief, for Connecticut Mut. Life Ins. Co.

John C. Sikorski with whom Robinson, Donovan, Madden & Barry, P.C., Springfield, Mass., was on brief, for Ursula C. Whyte.

George W. Marion with whom Philip J. Tarpey, Jr. and Bulkley, Richardson and Gelinas, Springfield, Mass., were on brief, for Charles A. Bergeron.

Before COFFIN, Circuit Judge, WISDOM * and ALDRICH, Senior Circuit Judges.

WISDOM, Senior Circuit Judge:

This appeal raises two issues: the first involves the scope and validity of federal regulations limiting the disclosure of hospital records relating to treatment for alcoholism and the second involves the application of Massachusetts statutes providing a civil cause of action to persons injured as a result of unfair practices in claim settlements by insurance companies. We conclude that the district court properly applied the federal regulations and limited the scope of disclosure of certain hospital records. We also conclude that the district court properly ruled in favor of one plaintiff on his unfair claim settlement claim and against the other plaintiff on her claim. We therefore affirm.

### FACTS

The plaintiffs, Ursula C. Whyte, the widow, and Charles A. Bergeron, a business associate, are the named beneficiaries of two life insurance policies issued by the defendant, Connecticut Mutual Life Insurance Company ("Connecticut Mutual"), on the life of S. William Whyte. Each of the two policies contained a clause excluding coverage if Mr. Whyte should die as a result of suicide. Mr. Whyte died on March 2, 1981, at his home in Wilbraham, Massachusetts. He was found sitting in his automobile, which was parked inside a closed garage, with the engine running. After efforts to revive Mr. Whyte were unsuccessful he was pronounced dead.

Following a brief investigation, the medical examiner concluded that Mr. Whyte had committed suicide by asphyxiating himself.

Mr. Bergeron and Mrs. Whyte filed claims with Connecticut Mutual asserting that Mr. Whyte had not committed suicide but had died as a result of an accident. Connecticut Mutual invoked the suicide exclusion clauses and refused to pay the claims. Mrs. Whyte and Mr. Bergeron separately sued in the Federal District Court for the District of Massachusetts on the insurance contract and under state consumer protection statutes. The cases were consolidated and went to trial in September of 1985. The issue in the contract claims, whether Mr. Whyte died accidentally or as a result of suicide, was presented to a jury. The consumer protection claims were presented to the trial judge.

Connecticut Mutual argued to the jury that Mr. Whyte was a troubled man. He had a history of alcohol problems and had been diagnosed as suffering from manic depression. He was engaged in the business of selling residential property and developing commercial property, and some of his business deals had resulted in major financial setbacks. He was separated from his wife who, despite his hopes for a reconciliation, intended to divorce him. Connecticut Mutual also noted the circumstances of Mr. Whyte's death and argued that they pointed conclusively toward suicide. Mr. Whyte was found in his car with the engine running inside a closed garage. Although the temperature outside was around 40 degrees and although Mr. Whyte had an important meeting scheduled for that afternoon, he was found wearing casual kakhi trousers, a short sleeve sport shirt, and no socks. When the police checked the automatic garage door opener on top of the console in the car, they found that it was in perfect working order.

The plaintiffs presented a different picture of Mr. Whyte to the jury. Although they admitted that Mr. Whyte had had some problems, they contended that he had overcome many of them. Mr. Whyte had

---

* Of the Fifth Circuit, sitting by designation.

recently received alcoholism treatment and had given up drinking. After receiving treatment he joined Alcoholics Anonymous and was proud of having overcome his drinking problem. Moreover, a business deal that Mr. Whyte had been working on was finally about to come to fruition; he was excited about its prospects. In addition, Mr. Whyte had hopes of a reconciliation with his wife. Witnesses testified that Mr. Whyte was a happy, forward thinking man making plans for the future. Indeed, on the afternoon of his death, Mr. Whyte was scheduled to meet with the lieutenant governor of Massachusetts.

The plaintiffs also argued that the circumstances pointed to the conclusion that Mr. Whyte's death was accidental. They presented experts who testified that most carbon monoxide poisonings are accidental. Carbon monoxide poisoning affects the body in such a way that the capacities to perceive danger and to perform even simple tasks such as turning off a car or operating a garage door opener are quickly and severely diminished, often in less than two minutes. Moreover, Mr. Whyte had a history of being forgetful and was not mechanically adept. The plaintiffs hypothesized that Mr. Whyte had stopped to look at the newspaper found in the front seat of his car and never realized what happened. Although Mr. Whyte was a constant notewriter, no suicide note was found.

The jury found for the plaintiffs concluding that Mr. Whyte had not committed suicide but had died accidentally. While the jury was deliberating, the judge considered the plaintiffs' claims that they were entitled to recover damages, attorney's fees, and costs under Mass. Gen. Laws chs. 93A & 176D. These are consumer protection statutes that prohibit unfair practices by insurance companies. The judge found that Connecticut Mutual had committed an unfair practice in its handling of Mr. Bergeron's claim but not in its handling of Mrs. Whyte's claim.

Connecticut Mutual now takes this appeal from the jury verdict on the contract claims and from the court's decision on Mr. Bergeron's unfair practice claim. Mrs. Whyte appeals from the court's decision on her unfair practice claim.

## DISCUSSION

### I. Beech Hill Records

Connecticut Mutual contends that it should be granted a new trial on the contract claims because the district court erroneously refused to release to Connecticut Mutual the complete Beech Hill Hospital records of Mr. Whyte on the grounds that federal law prohibited disclosure. Approximately four months before his death, Mr. Whyte was admitted to Beech Hill Hospital in Dublin, New Hampshire for alcoholism treatment. He remained at Beech Hill for 19 days. During discovery, Connecticut Mutual sought to obtain the complete records relating to Mr. Whyte's treatment. Mrs. Whyte, who was in possession of a copy of the records, asserted that the records were confidential under 42 U.S.C. § 290dd–3 (Supp.1985) and the regulations promulgated under that statute,[1] and therefore were not subject to discovery.

Section 290dd–3(a) prohibits disclosure of records relating to alcoholism treatment "which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States".[2] Section 290dd–3(b)(2)(C) [3] provides, however, that disclosure may be authorized by court or-

---

1. 42 C.F.R. §§ 2.1 to 2.67 (1986).

2. 42 U.S.C. § 290dd–3(a).

3. (2) Whether or not the patient, with respect to whom any given record referred to in subsection (a) of this section is maintained, gives his written consent, the content of such record may be disclosed as follows:

(C) If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.
42 U.S.C. § 290dd–3(b)(2)(C).

der upon a showing of good cause by the party seeking disclosure. After a hearing, the magistrate to whom the matter was referred ruled that Connecticut Mutual had established good cause. The magistrate concluded, however, that the regulations promulgated under § 290dd by the Secretary of Health and Human Services, particularly 42 C.F.R. § 2.63(a),[4] limited disclosure to "objective data" only and that Mr. Whyte's statements made during treatment could not be released. The magistrate therefore authorized the release to Connecticut Mutual of "sanitized copies" of the Beech Hill records containing only objective information.

Connecticut Mutual objected to this ruling arguing that Mr. Whyte's statements during treatment were crucial evidence concerning the key issue of his state of mind at the time of his death. Connecticut Mutual argued to the district court that the magistrate had erred for two reasons: first, § 290dd–3 does not apply in this situation because Beech Hill Hospital is not directly or indirectly assisted by the federal government and second, the nonobjective information is discoverable under Fed.R. Civ.P. 34. The district court rejected both arguments and upheld the magistrate's order limiting disclosure to the objective data contained in the records.

On appeal, Connecticut Mutual does not argue that § 290dd–3 is not applicable or that Fed.R.Civ.P. 34 allows discovery. Rather, Connecticut Mutual argues, apparently for the first time, that 42 C.F.R. § 2.63 is invalid because it is at odds with the statute under which it was promulgated, specifically § 290dd–3(b)(2)(C). This court has repeatedly held that "we will not consider a legal theory not presented to the trial court, however meritorious it may be".[5] Although this rule is not absolute, "it is relaxed only in 'horrendous cases when a gross miscarriage of justice would occur'".[6] "In addition, the new ground must be 'so compelling as virtually to insure appellant's success'." [7]

■ After reviewing the record, we find that upholding the regulation and limiting disclosure to objective data will not result in a "gross miscarriage of justice", nor is Connecticut Mutual's new position so compelling as virtually to insure its success.

■ The federal statute, 42 U.S.C. § 290dd–3, expressly authorizes the Secretary of Health and Human Services to develop "procedures and criteria for the issuance *and scope* of orders under subsection (b)(2)(C) of this section, as in the judgment of the Secretary are necessary or proper to effectuate the purposes of this section".[8] As the Supreme Court held in *Mourning v. Family Publications Service, Inc.*,[9]:

> Where the empowering provision of a statute states simply that the agency may "make ... such rules and regulations as may be necessary to carry out the provisions of this Act," ... the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation." [10]

**4.** *Limitation to objective data.* Except as provided in paragraph (b) of this section, the scope of an order issued pursuant to this subpart may not extend to communications by a patient to personnel of the program, but shall be limited to the facts or dates of enrollment, discharge, attendance, medication, and similar objective data, and may include only such objective data as is necessary to fulfill the purposes for which the order is issued.
42 C.F.R. § 2.63(a).

**5.** *Jones v. City of Somerville,* 735 F.2d 5, 7 (1st Cir.1984); *see also Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 73 (1st Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

**6.** *Jones,* 735 F.2d at 7, quoting *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979).

**7.** *Jones,* 735 F.2d at 7, quoting *Dobb v. Baker,* 505 F.2d 1041, 1044 (1st Cir.1974).

**8.** 42 U.S.C. § 290dd–3(g) (emphasis added).

**9.** 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

**10.** *Id.* at 369, 93 S.Ct. at 1660 (footnote omitted); *see also Alexander v. Trustees of Boston Univ.,* 766 F.2d 630, 639 (1st Cir.1985); *Merchants Nat'l Bank v. United States,* 583 F.2d 19, 22 (1st Cir.1978); *Melamine Chems., Inc. v. United States,* 732 F.2d 924, 928 (Fed.Cir.1984).

The purpose of § 290dd–3 is clear. Congress recognized that absolute confidentiality is an indispensable prerequisite to successful alcoholism research.[11] Moreover, confidentiality is necessary to ensure successful alcoholism treatment. Without guarantees of confidentiality, many individuals with alcohol problems would be reluctant to participate fully in alcoholism programs.[12] The regulations, especially § 2.63, were specifically drafted with these considerations in mind. Section 2.63 is rationally related to and furthers the congressional purpose of protecting patient confidentiality.[13] That it is more limiting than § 290dd–3(b)(2)(C) is not surprising, given that Congress specifically delegated to the Secretary authority to determine the scope of any court order authorizing disclosure of hospital records covered by the statute. The regulation at issue was promulgated in 1975,[14] and Congress amended 42 U.S.C. § 290dd–3 in 1976.[15] Thus, Congress had the opportunity to require a revision of 42 C.F.R. § 2.63, but declined to do so.

Connecticut Mutual argues—also apparently for the first time on appeal—that § 2.63 should not be read literally to prevent disclosure in a case such as the instant one where the patient's state of mind is the crucial issue. Related to this is Connecticut Mutual's policy argument that by bringing suit and putting the patient's state of mind at his death in issue, Mrs. Whyte, Mr. Whyte's widow, has waived the protection accorded under § 2.63.

■ We understand Connecticut Mutual's difficult position, but we are bound by the express and unequivocal language of the regulations. The regulations are clear that only objective data may be disclosed,[16] and no waiver has occurred in this instance. Section 2.63 makes clear that waiver can occur *only* "[w]hen a patient in litigation offers testimony or other evidence *pertaining to the content of his communications* with a program".[17] Even if Mrs. Whyte is substituted in the place of her husband, the patient, for purposes of this waiver provision, it is beyond question that she did not put "the content of his communications" with Beech Hill Hospital in question during the trial, and therefore no waiver occurred.[18] Notwithstanding Connecticut Mutual's assertion that Mr. Whyte's statements during treatment provided needed evidence on a key issue, the regulations place the confidentiality necessary to ensure the success of alcoholism treatment programs above that need,[19] and we must respect that decision.

## II. Unfair Claims Settlement Claims

### A. Bergeron's claims.

■ Mass.Gen.L. ch. 176D, § 3 prohibits certain unfair acts or practices in the business of insurance. Mass.Gen.L. ch.

11. S. 1125 (comment), 93d Cong., 2d Sess., 120 Cong.Rec. 13085, 13090 (1974).

12. *Id.; see also* H.Conf.Rep. No. 92–920, 92d Cong., 2d Sess. (discussing confidentiality provisions in parallel legislation involving drug abuse program records), *reprinted in* 1972 U.S. Code Cong. & Admin.News 2062, 2072.

13. Connecticut Mutual argues that no purpose would be served by maintaining the confidentiality of Mr. Whyte's Beech Hill records in the instant case because Mr. Whyte is dead. While it is true that disclosure cannot harm Mr. Whyte, it can harm his family and his reputation. In addition, the fear of post mortem disclosure may dissuade others who need treatment from seeking help or may prevent them from communicating with program personnel with the candor necessary for effective treatment.

14. 40 Fed.Reg. 27802 (1975).

15. Pub.L. 94–581 (1976).

16. *See United States v. Smith,* 789 F.2d 196, 205 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *People v. Garcia,* 128 Misc.2d 810, 491 N.Y.S.2d 552, 554 (N.Y. Crim.Ct.1985).

17. 42 C.F.R. § 2.63(b) (emphasis added).

18. *Cf. Allen v. Holyoke Hosp.,* 398 Mass. 372, 496 N.E.2d 1368, 1372 (1986) (unless the privilege is waived as required under the statute, no waiver of the social worker privilege occurs by the mere fact that a plaintiff has brought a suit and put certain facts in issue).

19. *Cf. United States v. Graham,* 548 F.2d 1302, 1314–15 (8th Cir.1977); *Bell v. State,* 385 So.2d 78, 80–81 (Ala.Crim.App.1980).

93A provides a civil cause of action to persons injured as a result of an unfair act or practice, including those prohibited under ch. 176D, § 3. Mr. Bergeron asserted a claim under ch. 93A contending that Connecticut Mutual had violated several subsections of ch. 176D, § 3(9) in the handling of his insurance claim. The district court concluded that in connection with Mr. Bergeron's insurance claim, Connecticut Mutual had violated ch. 176D, § 3(9)(g), which prohibits "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds".[20] Connecticut Mutual now argues that the district court erred in its interpretation of § 3(9)(g). According to Connecticut Mutual, an insurer does not violate § 3(9)(g) if it compels an insured to institute litigation when, as here, liability was not reasonably clear.[21]

But even assuming that § 3(9)(g) is not violated if the insurance company refuses to pay in the good faith belief that it has no liability,[22] Connecticut Mutual's conduct does not measure up to this standard. Once it became apparent that Connecticut Mutual might invoke the suicide exclusion clause, Mr. Bergeron broached the topic of a possible settlement. But Mr. Bergeron was informed by Connecticut Mutual that its policy was not to settle claims "until after suit except for a small amount". Indeed, Connecticut Mutual did not make any settlement offer until trial,[23]

---

20. After oral argument, we noted that although Connecticut Mutual had not raised the issue either at the district court level or on appeal, the plain language of § 3(9)(g) does not appear to provide a cause of action to Mr. Bergeron. Section 3(9)(g) prohibits "[c]ompelling insureds to institute litigation". But Mr. Bergeron is not an insured; rather he is a claimant or a beneficiary. We requested supplemental briefs on this issue and also on the propriety of our raising the issue *sua sponte.*

It cannot be disputed that the standard that must be met for this court to raise an issue on appeal is at least as high as the standard for a party seeking to raise an issue for the first time on appeal. Therefore, we must be convinced, at a minimum, that not raising the issue would result in a gross miscarriage of justice and that raising the issue would virtually ensure the success of the party on whose behalf the issue is being raised. *Jones,* 735 F.2d at 7. We conclude that this issue fails under both prongs of this test.

We continue to have doubts as to whether § 3(9)(g) was intended to benefit claimants or beneficiaries. *See Royal Globe Ins. Co. v. Superior Court,* 23 Cal.3d 880, 592 P.2d 329, 334, 153 Cal.Rptr. 842, 847, (1979) (en banc); *Green v. Holm,* 28 Wash.App. 135, 622 P.2d 869, 872 n. 3 (1981); *Jenkins v. J.C. Penney Casualty Ins. Co.,* 280 S.E.2d 252, 256 (W.Va.1981). Moreover, we have concerns as to whether § 3(9)(g) was intended to operate in situations such as this one. But the legislature and courts of Massachusetts have indicated that chs. 93A and 176D are intended to provide broad protection. *See, e.g., Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 489 N.E.2d 185, 197 (1986); *Leardi v. Brown,* 394 Mass. 151, 474 N.E.2d 1094, 1101 (1985); *Van Dyke v. St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 675, 448 N.E.2d 357, 360 (1983). We therefore cannot say with complete confidence that the courts of Massachusetts would not allow a claimant or beneficiary to assert a claim under § 3(9)(g). *See Michelin Tires, Ltd. v. First Nat'l Bank of Boston,* 666 F.2d 673, 682 (1st Cir.1981) (discussing manner in which a federal court should determine how the state supreme court would decide an issue of state law).

It would not be a gross miscarriage of justice to allow Mr. Bergeron to recover under § 3(9)(g). In effect, all that he will recover under that subsection is the attorney's fees necessary to recover the amount due under the policy. In other words, Mr. Bergeron is merely being allowed to recover from Connecticut Mutual the expense caused by their refusal to pay him what they owed. This is not unreasonable, given that Mr. Bergeron was the owner of the particular policy on Mr. Whyte's life and that it was Mr. Bergeron whom the policy was intended to protect. Considering these circumstances and that Connecticut Mutual never raised the issue at any point, we conclude that no miscarriage of justice would occur if we decline to decide this issue in favor of the insurer. We intimate no position as to how we would have decided the issue had Connecticut Mutual raised it properly.

21. The district court specifically concluded that liability was not reasonably clear in this case until the jury returned with its verdict against Connecticut Mutual.

22. Because we are able to dispose of this question of statutory construction without hazarding an *Erie* guess as to how the courts of Massachusetts would resolve the issue, we make no suggestion as to how we would construe this statute if required to do so.

23. Connecticut Mutual argues that its conduct does not precisely fall within that proscribed by

and then it offered only a fraction of what Mr. Bergeron recovered. The district court specifically found "uncontroverted evidence that Connecticut Mutual's failure to make a reasonable settlement offer was not a unique response to the particular circumstance of Mr. Whyte's death, but was rather consistent with Connecticut Mutual's standard claim settlement practice". In essence, the district court found that Connecticut Mutual's failure to make a reasonable offer was not predicated on a good faith determination that liability was not reasonably clear, and there is no indication that this finding of fact is clearly erroneous.[24] Even assuming therefore that an insurance company does not violate § 3(9)(g) if its reason for offering substantially less than the amount ultimately recovered is a good faith belief that liability is not reasonably clear,[25] Connecticut Mutual's conduct was still in violation of § 3(9)(g).

■ Connecticut Mutual next argues that even if it did violate § 3(9)(g) with respect to the handling of Mr. Bergeron's claim, it was improper for the district court to award Mr. Bergeron damages of $25.00 and attorney's fees, because Mr. Bergeron did not prove that he was injured or adversely affected by the violation. We conclude, however, that the district court's

award was proper. Chapter 93A, § 9(3) specifically provides for recovery "in the amount of actual damages or twenty-five dollars, whichever is greater", and ch. 93A, § 9(4) provides for the recovery of attorney's fees "in addition to other relief provided for by this section and irrespective of the amount in controversy". Therefore, it is clear that a plaintiff bringing an action under chs. 93A and 176D can recover $25.00 even if he can prove no damages,[26] and that an award of attorney's fees to a prevailing plaintiff is also proper in these circumstances. Even if Mr. Bergeron must show that he was adversely affected before he can recover any damages or attorney's fees,[27] there is no question that Mr. Bergeron was affected by Connecticut Mutual's violation of § 3(9)(g). As a result of Connecticut Mutual's violation, he was required to undertake time consuming and costly litigation, the very burden that § 3(9)(g) was enacted to eliminate.

### B. Mrs. Whyte's claims.

On appeal, Mrs. Whyte contends that the district court erred in concluding that Connecticut Mutual had not committed an unfair claim settlement practice in its handling of her claim. Mrs. Whyte asserted that Connecticut Mutual had violated Mass. Gen.L. ch. 176D § 3(9)(d)–(f).[28] The district

§ 3(9)(g), which prohibits offering "substantially less than the amounts ultimately recovered...." According to Connecticut Mutual, because it made no offer at all, it never offered substantially less than the amounts ultimately recorded. We conclude that this position is wholly without merit. In essence, Connecticut Mutual offered to settle with Mr. Bergeron for $0, and this is substantially less than the $250,-000 he ultimately recovered. Moreover, it is clear that Connecticut Mutual's offer of nothing compelled Mr. Bergeron to institute litigation. Were we to accept Connecticut Mutual's position, we would create a preposterous rule: An insurance company that offered to settle a claim for $1 could be found to violate § 3(9)(g), although no violation would have occurred had the company offered nothing. Such a rule would encourage insurance companies to offer nothing rather than to make a good faith offer based on the likely value of the claim. This would create the exact opposite incentives than the legislature had in mind when it enacted § 3(9)(g).

**24.** *See Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985).

**25.** *Cf. Van Dyke,* 388 Mass. at 677–78, 448 N.E.2d at 361–62 (under § 3(9)(f) it is insufficient for the insurance company to show after the fact that liability was not reasonably clear; rather, the company must show that it had a good faith belief that liability was not reasonably clear at the time it failed to effectuate prompt settlement).

**26.** *Leardi,* 474 N.E.2d at 1100–02.

**27.** *Cf. Van Dyke,* 388 Mass. at 678, 448 N.E.2d at 362.

**28.** (9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions:
(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

court found, however, that given the circumstances of Mr. Whyte's death, Connecticut Mutual had conducted a reasonable investigation and had denied coverage within a reasonable time. The district court also concluded that until the jury returned the verdict in favor of Mrs. Whyte and Mr. Bergeron on the contract claims, liability was not reasonably clear. Therefore, the court ruled that Connecticut Mutual had not violated § 3(9)(d), (e), or (f).

Mrs. Whyte contends that the district court's ruling was based on an erroneous interpretation of law for two reasons: first, the district court did not take into account the extraordinarily high burden of proof an insurer faces when it seeks to invoke a suicide exclusion clause in Massachusetts; second, the court failed to recognize that Connecticut Mutual owed a higher duty to Mrs. Whyte because of the extensive estate planning rendered in connection with the sale of the policy. We conclude, however, that the district court committed no error in its disposition of Mrs. Whyte's ch. 176D claims.

■ Although it is true that an insurer faces a high burden of proof when it seeks to invoke a suicide exclusion clause,[29] there is no reason to think that the district court did not consider this burden when it evaluated Mrs. Whyte's ch. 176D claims. Indeed, it is undisputed that the district court specifically included a discussion of this high burden in its instructions to the jury that considered the contract claims. Immediately after instructing the jury, the court considered Mrs. Whyte's ch. 176D claims. It is therefore reasonable to assume that the district court considered her ch. 176D claims in the light of the heavy burden an insurer seeking to invoke a suicide exclusion clause faces.

Mrs. Whyte also argues that Connecticut Mutual owed a higher duty to Mrs. Whyte while assessing her claim because of the extensive estate planning and financial consulting services it rendered along with the sale of the insurance policy. According to Mrs. Whyte, these additional services rendered Connecticut Mutual a fiduciary.

■ We must conclude, however, that in assessing her claim, Connecticut Mutual owed no fiduciary duty to Mrs. Whyte. She has not offered, and we have not found, any case in which an insurer was held to a higher duty with respect to its assessment of a claim as a result of estate planning services.[30] Connecticut Mutual owed a duty to Mrs. Whyte to handle her claim candidly, fairly, promptly, and in good faith.[31] The district court properly considered this duty when assessing Mrs. Whyte's ch. 176D claims.

■ Additionally, although not clearly articulated, Mrs. Whyte apparently contends that the district court erred as a matter of fact in concluding that Connecticut Mutual conducted a reasonable investigation, that Connecticut Mutual promptly denied coverage, and that liability did not become reasonably clear until the jury returned its verdict. She is asking this Court to review these issues de novo. We decline

(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]
Mass.Gen.L. ch. 176D, § 3(9)(d)–(f).

**29.** See generally E. Cleary, McCormick on Evidence § 343, at 972–73 (3d ed. 1984).

**30.** We note that Mrs. Whyte is not contending that Connecticut Mutual did not properly prepare and implement her husband's estate plan. Rather, she argues that these services entitled her to preferential treatment by Connecticut Mutual when it considered her claim. As support for her contention, Mrs. Whyte relies upon Polito v. Continental Casualty Co., 689 F.2d 457, 462 (3d Cir.1982), and Bicknell, Inc. v. Havlin, 9 Mass.App. 497, 402 N.E.2d 116 (1980). Neither case, however, provides any support. In dicta, the Polito court noted that in certain circumstances, New Jersey law recognizes a fiduciary duty on the part of an insurer when handling claims by third parties against the insured. That situation is wholly inapposite to the instant case, because there, the insurer is representing the interests of the insured. Such is not the case here. Indeed, it is clear that with respect to her claim against the company, Mrs. Whyte and Connecticut Mutual are in adversarial positions. Bicknell also involved a nonadversarial situation where the insurer was acting on behalf of the insured, and is therefore also inapposite.

**31.** Cf. Trempe v. Aetna Casualty & Sur. Co., 20 Mass.App. 448, 480 N.E.2d 670, 675, review denied, 396 Mass. 1102, 484 N.E.2d 103 (1985).

that invitation. The evidence supports the district court's findings; the findings are not erroneous.

 Finally, Mrs. Whyte argues that if Connecticut Mutual violated § 3(9)(g) in its handling of Mr. Bergeron's claim, that it also violated § 3(9)(g) in its handling of her claim. Although this argument is superficially appealing, it is without merit for two reasons, both of which are related to the fact that Mrs. Whyte chose to follow a different tack from Mr. Bergeron in her dealings with Connecticut Mutual.[32] First, unlike Mr. Bergeron, Mrs. Whyte failed to meet the demand letter requirement of ch. 93A. Chapter 93A, § 9(3) requires that "[a]t least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent". Such a demand letter should specifically list the deceptive practices claimed.[33] Mrs. Whyte's demand letter failed even to come close to meeting these requirements. Although her letter listed several violations and included copies of the relevant parts of the statutes with respect to those violations, the letter did not mention § 3(9)(g). The letter therefore not only failed to list § 3(9)(g), but by negative implication informed Connecticut Mutual that no such violation was being claimed.

The second reason Mrs. Whyte cannot recover under § 3(9)(g) is found in the plain language of § 3(9)(g), which prohibits "*[c]ompelling* insureds to *institute* litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds".[34] It is clear, however, that Mrs. Whyte was not compelled to institute litigation as a result of any offer by Connecticut Mutual. Mr.

Whyte died in March 1981. Mrs. Whyte submitted her proof of loss to Connecticut Mutual in April 1981. In May 1981, Connecticut Mutual advised her that it would be conducting an investigation—which eventually concluded in November 1981. Mrs. Whyte instituted litigation in September 1981, which was not only before Connecticut Mutual had informed her of its decision, but also before it had even made its decision.[35] Given these circumstances, Mrs. Whyte can hardly claim that Connecticut Mutual compelled her to institute litigation by offering her a low settlement.

In contrast, Mr. Bergeron submitted his proof of loss in June 1981, but did not bring suit until October 1983—after having been informed both that Connecticut Mutual was invoking the suicide exclusion clause and that Connecticut Mutual's policy was not to settle claims until after suit except for a small amount. He sent Connecticut Mutual a proper demand letter identifying § 3(9)(g) as a claimed unfair act.

We have considered all of the remaining contentions raised by Mrs. Whyte and Connecticut Mutual. We find them to be without merit.

## CONCLUSION

The district court properly applied 42 C.F.R. § 2.63 and limited the disclosure of the Beach Hill Hospital records to objective data only. The district court also properly concluded that Connecticut Mutual had violated Mass.Gen.L. chs. 93A and 176D, § 3(9)(g) with respect to its handling of Mr. Bergeron's claim but had committed no violation of chs. 93A and 176D in its handling of Mrs. Whyte's claim. The decision of the district court is therefore affirmed.

---

**32.** Mrs. Whyte was, at that time, not represented by her current counsel.

**33.** *Entrialgo v. Twin City Dodge, Inc.*, 368 Mass. 812, 813, 333 N.E.2d 202, 204 (1975).

**34.** Mass.Gen.L. ch. 176D, § 3(9)(g) (emphasis added).

**35.** The district court concluded that Connecticut Mutual was not required to inform Mrs. Whyte of its decision prior to when it did so in October 1981.